1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3    UNITED STATES OF AMERICA         .
                     Plaintiff,       .
4    vs.                              .   Docket No. CR 11-353
                                      .
5    MARC A. GERSEN                   .   Washington, D.C.
     LEE M. HYLTON                    .   December 15, 2011
6    MICHAEL A. TALON                 .
     JOHN CAUDLE III,                 .
7              Defendants.            .
     . . . . . . . . . . . . . . .    .
8

9              TRANSCRIPT OF STATUS CONFERENCE

10       BEFORE THE HONORABLE JUDGE REGGIE B. WALTON

11              UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Government:  Patricia Stewart, AUSA
                          U.S. ATTORNEY'S OFFICE
14                        555 Fourth Street, NW
                          Washington, D.C. 20530
15

16   Defendant Gersen:    Nikki Lotze, Esquire
                          LOTZE MOSLEY LLP
17                        400 7th Street, NW, Suite 202
                          Washington, D.C. 20004
18
     Defendant Hylton:    Jon W. Norris, Esquire
19                        503 D Street, NW
                          Suite 250
20                        Washington, D.C. 20001

21

22

23

24

25

1    APPEARANCES:  [Cont'd]

2

    Defendant Talon:      Jenifer Wicks, Esquire
3                          LAW OFFICES OF JENIFER WICKS
                          The Jenifer Building
4                          400 7th Street, NW, Suite 202
                          Washington, D.C. 20004
5

    Defendant Caudle:     Joanne D. Slaight, Esquire
6                          LAW OFFICE OF JOANNE D. SLAIGHT
                          400 7th Street, NW Suite 400
7                          Washington, D.C. 20004

8

    Court Reporter:  Cathryn J. Jones, RPR
9                     Official Court Reporter
                     Room 6521, U.S. District Court
10                    333 Constitution Avenue, N.W.

11

12

13

    Proceedings recorded by machine shorthand, transcript
14    produced by computer-aided transcription.

15

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2          THE DEPUTY CLERK:  Criminal Action Number 11-353,

3    United States of America versus Marc Gersen, Lee Hylton,

4    Michael Talon, John Caudle III.

5          Counsel, can you please come forward and identify

6    yourselves for the record.

7          MS. LOTZE:  Good morning, Your Honor.  Nikki Lotze

8    on behalf of Marc Gersen who is present.

9          THE COURT:  Good morning.

10         MR. NORRIS:  Good morning, Your Honor.  Attorney,

11   John Norris on behalf of Mr. Lee Hylton.

12         THE COURT:  Good morning.

13         MS. WICKS:  Good morning, Your Honor.

14   Jennifer Wicks on behalf of Michael Talon who's present.

15         THE COURT:  Good morning.

16         MS. SLAIGHT:  Good morning, Your Honor.

17   Joanne Slaight for John Caudle who's present.

18         THE COURT:  Good morning.

19         MS. STEWART:  Good morning, Your Honor.

20   Patricia Stewart on behalf of the United States.

21         THE COURT:  I assumed, based upon the filing that

22   the government made requesting that the running of the

23   speedy trial clock be tolled for some period of time

24   indicates that the government has not been able to, at this

25   point, provide discovery?

1          MS. STEWART:   That is accurate, Your Honor.   This

2     case was based on probable cause arrest and was indicted

3     rapidly.   We did provide counsel with the initial production

4     of discovery this morning, which involves documents and

5     photographs seized in -- the photographs are from one

6     search, the documents are from two searches.   There are

7     several more searches that we have to provide documents for.

8          I've represented to counsel that I hope by close

9     of business tomorrow or at least by Monday, a ledger or

10    notebook, which is about 75 pages, that was recovered during

11    one of the searches will be scanned and available to them on

12    a CD.

13          The larger problem in providing discovery within

14    the time frame that will allow both the government and

15    counsel to use it effectively, is that there are numerous

16    drugs that were seized and subject to analysis.   I was told

17    this morning -- we have asked the DEA who is participating

18    in this investigation to make every effort to expedite that.

19    I was told this morning they are hopeful that the drug

20    analysis in this case will be completed by the end of the

21    first week in January.

22          Probably taking longer would be the complete

23    analysis of the computers and all digital storage devices

24    that were seized.   Given the holidays, I don't expect that

25    analysis to be completed before the end of January.   If the

1   speedy trial clock is not tolled in any fashion by my

2   calculations, trial would be February 14th.  And for that

3   reason we ask for, what we believe is a reasonable period of

4   60 days in this case, of tolling the speedy trial clock.

5          THE COURT:  Is the defense in a position to

6   represent what your client's positions are regarding the

7   government's request to toll 60 days?

8          MS. LOTZE:  Your Honor, on behalf of Mr. Gersen,

9   my answer, somewhat, depends upon the Court's ruling on the

10  bond motion.  If Mr. Gersen were to be released it might

11  have a different view.  As it stands currently, I would

12  oppose the tolling of the time.

13         THE COURT:  Anybody else?

14         MR. NORRIS:  Your Honor, our position on behalf of

15  Mr. Hylton is basically the same.  The government chose to

16  proceed in this case with a rapid indictment, without

17  testimony at the preventative detention hearing.  We don't

18  think the government's case is quite as strong as it looks

19  at first blush.  So, for those reasons we would oppose the

20  tolling if Mr. Hylton is continued to be detained.

21         Otherwise, there's no violence in this case.

22  There's no prior criminal record.  We think the Court can

23  fashion conditions of release that would be appropriate.

24         MS. WICKS:  Your Honor, I actually have not

25  specifically spoken with my client about the filing, but the

1    government.  So, I would actually ask leave to be able to

2    discuss that with him before I take a position.

3         MS. SLAIGHT:  Your Honor, on behalf of Mr. Caudle,

4    we have no opposition to tolling the speedy trial.

5         THE COURT:  Has a bond review motion been filed on

6    behalf of your client, Mr. Norris?  I do have Mr. Gersen's

7    motion but I didn't have anything --

8         MR. NORRIS:  There was one filed last evening,

9    Your Honor.  I believe it was filed ECF.

10        There might be some confusion, because one of my

11   staff incorrectly clicked the wrong button.  And so, it

12   initially was filed as if it came from Mr. Talon, even

13   though it's clearly on behalf of Mr. Hylton.  It was then

14   re-filed correctly, I believe.  I do have a hard copy I can

15   tender to the Court, if that would assist the Court.

16        THE COURT:  I haven't seen it and I do like to

17   read these matters before I rule on them.

18        Has the government had a chance to respond?

19        MS. STEWART:  No, we haven't, Your Honor.  And we

20   would ask for that opportunity in the case of Mr. Hylton.

21        I received ECF notice.  I have a stamped copy,

22   approximately, 5:30 last night and I would ask for time to

23   respond to that.

24        THE COURT:  Very well.

25        Well in reference to Mr. Gersen, let me hear from

1    the government regarding what your evidence is.  I did

2    review the, I did review the Detention Memo that was issued

3    by the Magistrate Judge and I did review the Bond Review

4    Motions submitted on behalf of Mr. Gersen.  I don't know if

5    the government filed an opposition.

6          I do have your request for exclusion of time which

7    I think, I guess, sets forth some of the evidence as far as

8    what your position is.  But I'll hear from government

9    counsel regarding why you believe this is a strong case.

10          MS. STEWART:  Thank you, Your Honor.  The

11    government did not file a written response.  We received

12    this a few days ago and I spoke with Ms. Lotze by telephone.

13    She asked whether the government would be asking for more

14    time to respond and I said, we would be prepared to go

15    forward, providing there was no objection to the

16    government's responding orally and she said there would not

17    be.  So, we are prepared to proffer evidence in this case,

18    as to why the case against Mr. Gersen is stronger than what

19    counsel has described in her motion.

20          The first attack on the government's evidence is

21    that the source of the information that Mr. Gersen was

22    involved, with the individuals who were found in a hotel

23    room on December 1st, 2011, approximately five or six

24    o'clock in the evening, with over 600 grams with packaging

25    of crystal meth, over $4,000 in cash, drug paraphernalia.

1    Her argument is, the individual who said Mr. Gersen had been

2    in that hotel room, along with others, was the same

3    individual who rented the room.  Presumably, that means the

4    individual is so bias that he has blamed everyone else.

5          What I think is critical, Your Honor, is that this

6    individual was not caught in the hotel room.  Police

7    officers had no knowledge at all of the existence of the

8    hotel room, the meth in it or the individuals being in it,

9    until this source was seen at Mr. Gersen's apartment by his

10   management.  The management --

11         THE COURT:  He was seen at Mr. Gersen's --

12         MS. STEWART:  At Mr. Gersen's apartment, by

13   management.  Mr. Gersen rented --

14         THE COURT:  At what point in time, in reference?

15         MS. STEWART:  The same day.

16         He was trying to enter Mr. Gersen's apartment.

17   Management knew that Mr. Gersen's apartment had been

18   searched about two days earlier by police and they were

19   concerned that someone was trying to get into the apartment.

20         THE COURT:  When you say, was trying to get in, by

21   what method?

22         MS. STEWART:  By a key, but he was not authorized

23   to enter Mr. Gersen's apartment.  The only individuals that

24   were on the list to be, that were authorized to enter the

25   apartment other than Mr. Gersen's family members, were

1    Mr. Talon, his roommate and Mr. Hylton, his two

2    co-defendants.  This individual was not authorized to enter.

3              THE COURT:  You mean, authorization that would

4    have been given to the apartment --

5              MS. STEWART:  Exactly, Your Honor.

6              THE COURT:  -- building by Mr. Gersen?

7              MS. STEWART:  That's correct.

8              THE COURT:  Okay.

9              MS. STEWART:  So, police were called.  They

10   questioned him about why he was at Mr. Gersen's apartment

11   and it was at that time, for the first time, that police

12   learned that there were individuals in the hotel.

13             Had he not, had this individual not reported that

14   to the police, the individual would not have been under

15   suspicion as having been involved with that incident and

16   police would never have gone there.

17             So, it's not a question of someone who is caught

18   in the hotel, trying to work his way out by blaming it on

19   everyone else.

20             More importantly, this person was an eyewitness

21   over a period of days.  And what he said is corroborated in

22   large part.  There was a large quantity of methamphetamine

23   in the hotel room, where he said it would be.  There was a

24   large amount of cash and Mr. Hylton, Mr. Talon and Mr.

25   Caudle were, in fact, in that room.

1          THE COURT:  Where was this hotel?

2          MS. STEWART:  It's located -- and I apologize,

3     Your Honor, I think it's 1601 Rhode Island Avenue,

4     Northwest, here in the District, the Beacon Hotel.

5          It is true that Mr. Gersen was not present when

6     police entered the room.  That's absolutely true and counsel

7     has noted that he was arrested by police, he wasn't even

8     inside the hotel but what is not mentioned is why he was not

9     inside the hotel.

10          The eyewitness source reported to police that

11    Mr. Gersen had been in the room, but Mr. Gersen left for a

12    period --

13          THE COURT:  This is the same individual who is --

14          MS. STEWART:  The same individual, he had been

15    there earlier.

16          What this source individual, call him, did not

17    know was that Mr. Gersen had left the room for a period of

18    time.  While police officers were in the room conducting the

19    search, Mr. Gersen called up to the room.  He -- one of the

20    police officers answered the, a phone that was ringing.  And

21    Mr. Gersen said, is it safe to come up now?  The police

22    officer said, yeah, come on up.  They did not allow him to

23    come tom the room.

24          And the reason they didn't was, there was two

25    reasons.  One, around the hotel area were two marked police

1  cars in the back -- or on Church Street which is in

2  proximity.  And there was several unmarked but, probably,

3  recognizable as police cars, in front of the hotel.

4          The concern was, by asking is it safe to come up,

5  Mr. Gersen may have had some suspicion that there were

6  police in the area, but it was a hotel.  So, he asked is it

7  safe to come up.  He didn't know why they were there.  Had

8  they let him come up to even the floor, the eighth floor, he

9  would have seen the door open, police officers coming in and

10 out and both, for safety reasons and to avoid the risk of

11 flight, they did not allow him to enter the hotel.

12          So, it was, it was not any lack of will on his

13 part to enter.

14          THE COURT:  So, where exactly was he allegedly

15 stopped?

16          MS. STEWART:  Seventeenth and Rhode Island Avenue,

17 as he approached the front of the hotel.

18          THE COURT:  How far away from the hotel?

19          MS. STEWART:  I can not answer the Court in terms

20 of distance.  The hotel is located in the 600 block of Rhode

21 Island Avenue.

22          THE COURT:  Six hundred or 1600?

23          MS. STEWART:  It is in the 1600 block or 1601, I

24 believe.

25          Police officers advised me that, as he turned the

1   corner where the front of the hotel was, that's where they

2   stopped him.  But what I believe is significant, Your Honor,

3   is that he was about to enter that hotel and asked whether

4   it was safe to come and he was on his way in.  So, the idea

5   he wasn't present doesn't, doesn't really mean anything.

6   Had police officers entered that room a half and hour later

7   than they did, they would have found Mr. Gersen in the room.

8            Counsel has also referred to Mister --

9            THE COURT:  Now was anything recovered during the

10  search that took place at his apartment?

11           MS. STEWART:  There was a small quantity of

12  methamphetamine.  There was a quantity of GHB, recipes for

13  GHB.  The -- I can not pronounce the full chemical name,

14  Your Honor, sodium and potassium was found.  Mr. Gersen was

15  not home.  Mr. Gersen was visiting his family in Florida.

16  His roommate and co-defendant, Mr. Talon was there, but

17  Mr. Gersen was not.  We agree with that.

18           The charge is conspiracy.  There was recovered,

19  during the search of the hotel room, approximately 75-page

20  of handwritten notes of Mr. Hylton.  As I've told counsel, I

21  was unprepared to bring the entire document with me today.

22  It's being scanned.  It will be available to them in the

23  next discovery production.

24           THE COURT:  How do you know they're handwritten

25  notes of Mr. Hylton?

1            MS. STEWART:  Well, Your Honor, it says on the

2    front of it, if in case of lost, please return to Lee

3    Hylton, with an address, a phone -- excuse me, a phone

4    number and then, and email; leehylton2000@yahoo.com.  The

5    handwriting, that's in handwritten form.  There's also a

6    handwriting that, I mean, it's obvious it is the same

7    handwriting and his name is on the front of it.  And I

8    brought a copy for the Court of excerpts and I've given

9    counsel a copy of those excerpts.  The entire document is

10   being scanned and will be available to counsel by close of

11   business tomorrow or Monday, at the latest, in the next

12   production of discovery.

13           But to say that Mr. Gersen's case is weak for a

14   conspiracy charge and that Mr. Gersen's name is just

15   mentioned in this ledger, I would represent to the Court and

16   the Court can see for itself, that this ledger which is

17   essentially a diary.

18           It contains personal notes by Mr. Hylton about his

19   relationships, his feelings.  It has a point in such as

20   haircuts and furniture ordered.  But interspersed with it

21   are significant amounts of entries which reflect drug

22   transactions.  I look at the page nine with which we

23   provided to the Court, there's references there to numbers

24   and amounts that were paid Mike's water and numbers 3.5, I

25   think, is particularly significant.  The Court and anyone

1   casually connected or familiar with drug transactions knows

2   that 3.5 is an eighth of an ounce or an eight ball, amounts

3   in which drugs such as methamphetamines are trafficked.

4          And on page 14, if it's not clear, there is at the

5   bottom of the page, 3.5 at 380, three tomorrow, one-gram

6   gratis for past customer.  I mean, it's clear there are drug

7   transactions in this ledger.

8          And while we agree that Mr. Gersen's name appears

9   in neutral or innocent things, like, having dinner or

10  spending time at a hotel.  They are also connected with drug

11  transactions.

12         On page 27 there is a reference called,

13  Franklin C, Mark, and two lines under a series of numbers

14  and amounts, all in even amounts.  And then, on this other

15  column, took full leader lemon, question mark, ounces.

16  There was 14-ounces left in it, Mark, question mark, yes.

17  That we submit -- we would present evidence, is a reference

18  to GHB which is found in a liquid form.

19         On page 55, Mark wants to move forward, doesn't

20  want to take anything, doesn't want to be a big money --

21  excuse me, be a money pit, et cetera.  And then, underneath

22  there are a series of numbers, is a reference to a rate of

23  return.  But it's -- underneath that, is a series of numbers

24  and received two, paid 37 and then, two, a line down, 80,

25  slash, grams 80 times 3.5, four balls, et cetera.

1          And finally, Your Honor, and I -- obviously, I'm

2     taking selective passages but I think they're significant.

3     On page 64 there's a reference to a Defendant, Jeremy

4     Fassina, who has been indicted in this court for trafficking

5     methamphetamine.  And there are some speculations about what

6     he's going to do with his case and whether he's going to

7     work something out with the individual who they believed

8     provided information about him.  But the last two lines, it

9     is postulated that Ray will then implicate Nick and Mark.

10          And I would suggest, if there was no reason to

11     implicate Mark, in his codefendants' view, that would not be

12     written that way.

13          So for those reasons, Your Honor, it's clearly --

14          THE COURT:  Where's that reference?

15          MS. STEWART:  That reference is on page, the last

16     page of what I submitted to the Court, page 64, the

17     left-hand column.  The last line of the first full

18     paragraph.

19          We do not believe our case is weak.  Certainly,

20     counsel will attack it at trial.  But for purposes of

21     detention, it is not the case that counsel proffered in her

22     motion.  We --

23          THE COURT:  And this individual, who was trying to

24     get into Mr. Gersen's apartment, what did he say was taking

25     place in the hotel?

1          MS. STEWART:  He said in the hotel, there were --

2     well, there were two hotels.  In the Beacon Hotel, where the

3     search was conducted, he said that Mr. Hylton had quantities

4     of methamphetamine there.  He said that there were phone

5     calls to Mr. Gersen, but he does not say that Mr. Gersen had

6     drugs in his hand.  I want to make that clear.

7          What he said that, Mr. Gersen telephoned.  He was

8     told by Mr. Talon -- or Mr. Talon said he should have stayed

9     away.  We told him to stay away.  There were discussions

10    about prices.  There were drugs transactions took place, but

11    no, they did not take place in view of the source with

12    Mr. Gersen and we don't say that they did.

13          Mr. Gersen was in Florida.  He returned at about

14    9 o'clock that morning.

15          THE COURT:  So, he doesn't, he doesn't say

16    anything about what Mr. Gersen's purported involvement was

17    in this conspiracy?

18          MS. STEWART:  This particular source, no, he does

19    not.  There is other --

20          THE COURT:  Does anybody?

21          MS. STEWART:  Yes.

22          THE COURT:  What's that?

23          MS. STEWART:  That Mr. Gersen engaged in

24    methamphetamine sales with another individual, who's not

25    indicted in this, prior to these incidents in the hotel.

1          THE COURT:  And this individual would know this,

2  based upon what?

3          MS. STEWART:  Being involved in the transactions.

4          THE COURT:  And the individual says that, that

5  person made purchases from Mr. Gersen?

6          MS. STEWART:  That's correct.

7          THE COURT:  On how many occasions?

8          MS. STEWART:  I don't have that with me at this

9  time.  Actually, two individuals have said that.  I don't

10  have the number of times the transactions took place.

11          THE COURT:  And how are these individuals able to

12  identify the person, they say, they purchased these drugs

13  from as this defendant?

14          MS. STEWART:  Because they know him socially.

15  This type of drug trafficking is done largely within a

16  community of people who know each other and socialize with

17  each other, as opposed to street sales and sales on a

18  corner.  They knew him socially, knew where he lived, gave

19  his address.  They are not indicted in this case.

20          THE COURT:  Was there any other means by which

21  they identify him as the same person who's in court, besides

22  just identifying the address where he lived?

23          MS. STEWART:  His photograph, his full name -- his

24  name, other than his middle name.

25          THE COURT:  Anything else?

1          MS. STEWART:  Not in terms of the government's

2     case, Your Honor, at this time.

3          THE COURT:  Response?

4          MS. LOTZE:  Yes, Your Honor.  I hope it's clear

5     that the sources or source of that last bit of, you know,

6     arguably more compelling information are either one or both

7     people who have charges pending against him.  So, with

8     respect to the sources who claim to have, you know, personal

9     knowledge of Mr. Gersen's involvement, the government is

10    represented that they, unlike the first source, do have

11    cases pending against them.  And in the police officers own

12    words, you know, are people who are trying to work off a

13    beef, I think is the way that Officer Fanone put it.

14         So, I don't hear anything different today than

15    what I summarized in the bond motion.  I mean, the

16    government has represented that it has these two sources of

17    information.  The one source, the first source that's been

18    discussed today, is the person who we've been told rented

19    the hotel room in which the drugs were found.  That same

20    person had, in Mr. Gersen's apartment, had obviously the key

21    to Mr. Gersen's apartment, we now know and stored a variety

22    of personal items in that apartment.

23         Now, the Court should recall, Mr. Gersen was away

24    from the jurisdiction from the 22nd to the 30th.  And during

25    that time he's, as we heard today, had given authorization

1    to, purportedly, to Mr. Hylton and to Mr. Talon, to come and

2    go from the apartment, says the government.  He had not

3    given authority to this other individual to come and go from

4    the apartment.  That individual had a variety of mail matter

5    and personal documents in the apartment which we can't

6    presume that Mr. Gersen knew anything about.

7            I mean, he's away in Florida and can't be tasked

8    with knowing what's going on in his place, when he's --

9    there are evidently people who have keys that he

10   doesn't even -- hasn't authorized to have keys.  So, it's

11   that person who then is caught trying to get into the

12   apartment, for who knows what reason, who then gives up

13   information that is one of the government's sources of

14   information against Mr. Gersen.  So, although it might be on

15   first flush, sort of, appealing to think of that person as,

16   sort of, an uninvolved.  But certainly, how the government

17   has said, because he has no cases pending against him, you

18   can trust what he says, I see the situation very

19   differently.  Where he's a person who's trying to gain

20   unauthorized access to the apartment, in which a variety of

21   documents in his name have been found.

22           And so, you know, Mr. Gersen calls, according to

23   the government, calls the hotel, says, is it safe for me to

24   come up.  What's to say, he's the, he's the one person in

25   the group who's in law school.  He's evidently aware of what

1    his friends are up against.  Why isn't he -- there are all

2    kinds of innocent explanations for why he would be trying to

3    have contact with them and not get himself in any trouble.

4    Is it safe to come up.  Are you guys -- I mean, that doesn't

5    make him a part of the conspiracy.

6         I don't, I don't see how the government's

7    evidence, based on the sources of information which are

8    before the Court, is a strong case against Mr. Gersen at

9    all.  I mean, there's a, there's a ledger which -- it had

10   been represented previously --

11        THE COURT:  I mean, in and of itself, you may be

12   correct, the fact that he makes this call and ask is it safe

13   to come up, may not indicate a part of the conspiracy, but

14   you can't consider that in a vacuum either.  You have to

15   consider that in the context of all the other evidence the

16   government says links him to this activity.

17        MS. LOTZE:  Right.  But what the government --

18   with all the other evidence the government says, there's

19   evidently one or maybe two corroborators, who when, you

20   know, trying to work off their own case, implicate

21   Mr. Gersen.  And there's this one person who's, you know,

22   all over the evidence in Mr. Gersen's apartment, without

23   having the right be there. And then says, oh, you know, he

24   has this hearsay knowledge evidently of Mr. Gersen's

25   involvement.

1          It doesn't strike me as a compelling case against

2     Mr. Gersen.  Now the government points to this ledger and

3     previously, it had been represented that Mr. Gersen's first

4     and last name appeared in the ledger.  I don't actually --

5     I'd be surprised --

6          MS. STEWART:  It did.

7          MS. LOTZE:  Okay.  That didn't -- it surprised me

8     that that wasn't part of the included entries in today's

9     submission.  Although, I understand that there's more to

10    come as far as the ledger is concerned.

11         I don't, I mean, Mark, even spelled with a C, is

12    not the most uncommon name around.  And so, I don't see

13    this, the ledger that is, being a significant piece of

14    evidence against Mr. Gersen.  Certainly, the two are

15    socially friendly, there's no denying that but that doesn't

16    make Mr. Gersen a participant in a methamphetamine

17    conspiracy.

18         When you consider the strength of the government's

19    evidence which, of course, is only one of the considerations

20    at this stage, against what else Mr. Gersen brings to the

21    table, that he is a student at Georgetown University Law

22    Center.  That he has people in the community who are willing

23    to, not only write letters of support for him, but an ANC

24    commissioner who's willing to take him into his house and

25    has provided his phone number for any, sort of, contact that

1    people want to have with him, beforehand, to verify, you

2    know, that this is, would be a legitimate place to stay.  I

3    think that's very powerful evidence, that the Court can

4    trust Mr. Gersen to comply with conditions of release in the

5    community.

6            I, frankly, have never been in a position

7    previously to submit that strong community support for a

8    person's release.  So, I think that not only does the Court

9    have the, sort of, mediocre, I think, at best.  The Court

10   might think stronger but that's the government case, if the

11   Court has all the indicia that Mr. Gersen could be trusted

12   to be in the community.

13           One of the things that the Magistrate Judge said

14   at the hearing and then, I'm not sure it comes through as

15   clearly in the Detention Memorandum, but one of his -- one

16   of Judge Facciola's, sort of, strongest points that he made

17   in favor of detention was that, once folks were aware that

18   law enforcement attention had been attracted, they kept on

19   with the activity.  That -- you can't say that for

20   Mr. Gersen.  Mr. Gersen was in Florida when law enforcement

21   attention was attracted.  He came back and was arrested

22   walking into a hotel room.

23           I mean, you can't say that he continued in.  If

24   the Court believes that initially he was involved in

25   anything, you can't say the same thing for Mr. Gersen that

1   can be said for others.  And so, I think in light of all of

2   the evidence, in light of all the factors that the Court

3   must consider at this stage, there -- Mr. Gersen has

4   rebutted the presumption.  Particularly in a case where

5   there's not any allegation of any violence, where the

6   conspiracy is, you know, from November to December and the

7   arrest was made December 1st.  It's not, you know, a long

8   reaching conspiracy, certainly.

9           And it seems that the evidence that the government

10  would present in support of the allegation that there's a

11  conspiracy, largely centers around the last week or so in

12  November.  Mr. Gersen's apartment is searched, I think, on

13  November 28th, if I'm not the mistaken, or 29th.  So -- am I

14  right?

15          So, Your Honor, I just -- of all the cases that

16  the Court sees, of all the conspiracies which the Court has

17  presided over, where there's not any allegation of any

18  violence, where the conspiracy lasts for allegedly, maybe a

19  couple of weeks and where the evidence is what it is in this

20  case, and where Mr. Gersen presents a strong community

21  support, I think this is not a case that warrants pretrial

22  detention.

23          THE COURT:  Why do you say the conspiracy only

24  lasted a couple of weeks?

25          MS. LOTZE:  Well, it seems to me that the

1   government -- well, what's been presented is the evidence of

2   the conspiracy is that is what was discovered in

3   Mr. Gersen's apartment, which was on November 29th.  They

4   were arrested on December 1st.  And so, there isn't much

5   time left in which --

6         THE COURT:  But also, this document that they

7   presented would suggest, if it's in fact indicating what the

8   government purports it does, would relate back to

9   August 20, 2011 is what's indicated on page 9, where it

10  indicates payments purportedly made by a person named Mark

11  in the amount of $4,500.

12        MS. LOTZE:  But what's charged, Your Honor, is the

13  conspiracy from November to December of 2011.

14        THE COURT:  Government counsel, what evidence is

15  there in the record that would support the magistrate

16  judge's position, that Mr. Gersen would have had reason to

17  know that there was an investigation regarding this activity

18  by law enforcement, at the time he would have made the call

19  to the room?

20        MS. STEWART:  I think there are several,

21  Your Honor.  Now, first of all, as the Court will note on

22  page 64, there is a reference to it being postulated that an

23  individual will then implicate Nick and Mark.

24        As early as mid-October, Jeremy was seen at the

25  apartment that was searched.  This was common knowledge

1    among his associates including Mr. Gersen.  In fact, when

2    Mr. Gersen was arrested, the pacer printout of Mr. Fassina's

3    ultimate arrest and case was on his person.

4              THE COURT:  On his what?

5              MS. STEWART:  On his person.  The printout of the

6    court proceedings in Mr. Fassina's case, there were

7    documents, court documents, relating to Mr. Fassina.

8              He knew he was --

9              THE COURT:  And that was in whose possession?

10             MS. STEWART:  Mr. Gersen, when he was arrested.

11             He knew his associates were under investigation.

12   One of them, indeed, had been arrested.  The arrest actually

13   took place of Mr. Fassina on November 23rd.

14             As indicated here, there was reason at least to

15   Mr. Hylton's view and we assume in Mr. Gersen's, that he

16   might be implicated by Mr. Fassina, with whom he had made

17   actual transactions.  So, he knew his associates were under

18   investigation, at least.

19             That is one of the reasons why we, we believe why

20   he asked whether it was safe.  He was very careful.

21   Mr. Gersen is a law student.  He is very intelligent.  He is

22   very, very careful.

23             THE COURT:  Is there any indication he would have

24   known his apartment had been searched before he made that

25   call?

1          MS. STEWART:  Yes, Your Honor.  We have a witness

2    who will testify that he was advised by telephone that the

3    apartment had been searched.  Indeed, the witness said in

4    the hotel room, when the police, right before the police

5    came in and Mr. Gersen called from Pentagon City saying he

6    was there, told him, he should have stayed away.

7          We know all of his associates knew it was searched

8    and it's almost incredible to believe they did not alert

9    him.

10          Indeed the reason they took drugs out of

11    Mr. Gersen's apartment and moved them to hotel over a period

12    of two days, was because Mr. Hylton and Mr. Talon and

13    Mr. Caudle knew about the search.  They, Mr. Caudle --

14    Mr. Talon was living there.  They knew about the search.

15          They moved, they got together, they moved their

16    drugs to a hotel.  And yes, Mr. Gersen was alerted.

17          THE COURT:  I'm confused.  They moved them,

18    allegedly, at what point?

19          MS. STEWART:  The evidence --

20          THE COURT:  During the search or after the search?

21          MS. STEWART:  After the search of Mr. Gersen's

22    apartment, before the search of the hotel.  They moved them

23    according to the evidence we have, what drugs had been --

24          THE COURT:  After the search of Mr. Gersen's

25    apartment, you say?

1          MS. STEWART:  Yes.  After --

2          THE COURT:  But if there was a search why wouldn't

3    the police have recovered it and therefore, there wouldn't

4    have been anything to move?

5          MS. STEWART:  I misspoke.  On Monday,

6    November 28th, are evidence was, the day before Mr. Gersen's

7    apartment was searched, there was methamphetamine brought to

8    that apartment by Mr. Hylton and another small amount by

9    Mr. Caudle.  It was not left overnight, I misspoke.

10          On Tuesday, around noontime or at midday,

11    Mr. Gersen's apartment was searched.  The drugs -- those

12    drugs were gone, only a small amount was left.

13          THE COURT:  What's your predicate for suggesting

14    that the drugs would have, assuming there were in the

15    apartment at some point, that they were moved because of

16    concern regarding police activity?

17          MS. STEWART:  Because of witness information that

18    that is the reason that the conspirators met in the hotel

19    room, to stay away from Mr. Gersen's apartment.  It was

20    under suspicion.  It had been searched.  The police were

21    looking at it.

22          THE COURT:  Well, I thought you said it had not

23    yet been searched when it was allegedly moved.

24          MS. STEWART:  They moved it but they -- they moved

25    it Monday but they were not going to go back to Mr. Gersen's

1  apartment.  When I say that, they were going to no longer

2  use Mr. Gersen's apartment.  They were going to move

3  themselves and their drugs to another location for in the

4  future.  And that took place on Tuesday afternoon after the

5  search.

6          No, the drugs were not physically in the apartment

7  during the search.  It was only a small amount in GHB, but

8  there had been there the night before.  They had met in the

9  apartment with quantities of drugs.  After the search, they

10 decided to move their location, meeting location to hotels.

11         THE COURT:  And somebody says that that was done

12 because of the concern of police involvement in this

13 situation?

14         MS. STEWART:  Yes, absolutely.

15         With respect, we do not contest what counsel said

16 about Mr. Gersen being a law student, about his having

17 community ties.

18         THE COURT:  What about these other, these two

19 individuals who say they made purchases from him?  Is the

20 defense correct that they have cases and that they are

21 providing information to try and help themselves in

22 reference to their own situation?

23         MS. STEWART:  I think anyone who cooperates in a

24 drug conspiracy is hoping to help themself.  I've been

25 seeing that in every narcotics conspiracy.  There are a few

1    people who do it simply out of a willingness to help the

2    police.  Of course, they are looking for something.

3              In one case though, I really would prefer not to

4    get into the negotiations and everything in the case, but I

5    can represent that these individuals are, whatever their

6    motives and their intentions, are not actively cooperating

7    with the government at this time.  I mean, I don't know how

8    much more I can say without getting into what I do not want

9    to say in open court.  This is not a case where these people

10   have entered guilty pleas and are under cooperation

11   agreements or anything of that nature.

12             And I would also indicate that -- I really prefer,

13   Your Honor, not to get into details of other defendant's

14   cases.

15             THE COURT:  But they have not pled guilty?

16             MS. STEWART:  That's correct.

17             THE COURT:  Okay.  Let's take a short break.

18             MS. LOTZE:  Your Honor, may I just quickly before

19   you break, two quick -- three quick points.

20             First, with respect to the fact that Mr. Gersen

21   had on him the Pacer printout from Jeremy Fassina's court

22   case, when Mr. Gersen returned to the area from Florida, he

23   came to visit me.  And based on my own investigation of what

24   could be going on, I handed him the Pacer printout that he

25   had with him.  So, to the extent that the Court thinks that

1    Mr. Gersen is somehow using his law student, you know,

2    abilities to get on Pacer, that's just not accurate.  He

3    didn't even know Pacer existed before I handed him the

4    printout.

5            Secondly, the point I was trying to make about the

6    concern -- and regardless of Magistrate Judge, Facciola

7    concern that the Court might have, that law -- the

8    activities continued after the law enforcement detention.

9    You know, what the government, all of what the government

10   said in response to the Court's inquiry about that, occurred

11   without Mr. Gersen being in town.

12           So, my point is that, whatever concern might

13   exist, with respect to continuing activities after law

14   enforcement, you know, attention, Mr. Gersen was in Florida.

15   He was in Florida until the 30th.  He came back, he came to

16   my office and he was arrested, you know, having called up to

17   the hotel, you know, where his friends were.

18           So, there's not -- you can't attribute any of

19   that, sort of, you know, lack of ability to trust a person

20   in the community to Mr. Gersen.  There's absolutely no

21   evidence, nor has the government proffered in response to

22   the Court's question, any evidence that Mr. Gersen continued

23   any activity, you know, after his apartment was searched

24   while he wasn't even in town.

25           Finally, Your Honor, I heard the government say

1    that some drugs were moved from Mr. Gersen's apartment to a

2    hotel on the 29th, I think, the government said or the 28th.

3    And the discovery that we've been provided this morning

4    reflects that the first hotel room is rented on the 30th.

5    So, I don't think that it, on all of those days, Mr. Gersen

6    was in Florida.  And so, it doesn't so much impact my

7    argument.

8         But I'm not sure that, I'm not sure about the

9    representations the government's making based on the

10   discovery we've been provided.

11        MS. STEWART:  If I may, just briefly, to correct.

12   I clearly misspoke when I suggested that drugs were moved

13   after the search.  The people dealing the drugs moved their

14   meeting location after the search.

15        Secondly, I did not mean in any way to suggest

16   that, something about being a law student and knowing Pacer

17   had anything to do with this case.  The Court asked whether

18   Mr. Gersen was aware of the investigation and I proffered

19   that information about his having an individual with whom he

20   had engaged in drug dealings, having information about that

21   person's being arrested and having a case in court on his

22   person, to show to the Court that he knew very well about

23   this investigation, for whatever weight the Court wishes to

24   give it.

25        With respect to any misrepresentation about the

1   dates of the hotel, I don't have all of the discovery of the

2   record -- excuse me, the hotel records, at this point, but

3   the move of Mr. Talon to another hotel where he and

4   Mr. Hylton are caught or met, was done on Tuesday afternoon.

5   It was not the Beacon Hotel.  It was the Donovan House and

6   then they moved from the Donovan House to a second hotel.

7          On the date, I do not have the Donovan Hotel

8   records yet.  I will produce them when I get them.

9          THE COURT:  And all of the individuals who

10  allegedly were a part of this conspiracy lived in the D.C.

11  area and all have some type of apartment or house that they

12  live in here?

13         MS. STEWART:  I believe it's fair to say that, to

14  our knowledge, they live in the D.C. area but I can not say

15  that individuals, including individual defendants in this

16  case, have a permanent residence, permanent residence that I

17  can identify to the Court.  Mr. Talon, in particular, was

18  living with Mr. Gersen after the initial hearing.  It was

19  obvious he should not be living in a co-defendant's house.

20  And there was some concern by Magistrate Judge, Facciola and

21  his then counsel, in getting him other housing.  I, frankly,

22  don't know where he's living right now.

23         [Thereupon, recess taken at 10:24 a.m., resuming

24         at 10:33 a.m.]

25         THE COURT:  I don't know if this is a relevant

1    consideration, but did the government make a request for the

2    detention of the two individuals who are on release?  And if

3    you did, why did the Magistrate Judge make a difference

4    between their status and the two individuals who are

5    detained, their status?

6            MS. STEWART:  We did not request that Mr. Caudle

7    and Mr. Talon be detained.  We request they be released

8    under strict conditions.  It was the government's analysis,

9    the government's opinion, that they presented less of a

10   danger to the community because of their roles in this

11   organization and there were other factors including --

12           THE COURT:  What was their alleged role that was

13   significantly different than Mr. Gersen's role?

14           MS. STEWART:  It was the government's view, based

15   upon the information that it had, that Mr. Talon essentially

16   worked for Mr. Gersen; running errands, receiving packages,

17   cleaning his house and doing things of that nature.  He was,

18   essentially -- so that Mr. Gersen -- so when Mr. Gersen

19   wasn't there he took care of things.  In exchange, he was

20   allowed to live with Mr. Gersen.

21           With respect to Mr. Caudle, it was our information

22   from a variety of sources -- and I would note, his name

23   appears, if at all, as John.  I don't even know if it's the

24   same John, not in the same context in the ledger.  But the

25   information was consistent, that he was a lower-level dealer

1   who did small, a small amount of sales and was not at the

2   upper echelon as was Mr. Gersen and Mr. Hylton who were the

3   leaders, if you will, of the conspiracy.  We found that

4   information credible.  Based on --

5            THE COURT:  What is your evidence that Mr. Gersen

6   was one of the top players in this alleged conspiracy?

7            MS. STEWART:  It came from several persons who had

8   dealt with him.  Information that he, at some times would

9   not make personal deals but tell them, customers, wholesale

10  customers, to deal -- if they want to deal with him, to deal

11  through someone else, to deal with him.  There was

12  information that he had transported significant amounts of

13  cash which we have not verified, we're in the process of.

14           But essentially at the time of the detention

15  hearing, what we had learned from other individuals who were

16  associated with these defendants and again, I would stress,

17  this is a social community as well as a group of people who

18  use and sell drugs, that those individuals presented less of

19  a danger to the community.  There were also other reasons

20  involving the need for health treatment in the case of one

21  of the defendants that was very significant.  While we

22  understand medical alerts were issued on all defendants, one

23  of the defendants had much more serious health, health

24  issues which I would prefer not to speak about in open court

25  but we were convinced, mandated his being available for

1   treatment at a local hospital.

2          THE COURT:  Okay.

3          MS. LOTZE:  May I just briefly?

4          Your Honor, I hope it's clear to the Court, the

5   folks who the government says make it apparent that

6   Mr. Gersen is, you know, one of the more -- one of the

7   leaders, are cooperators.  This is not -- I mean, the Court

8   heard the government say earlier that the individual who --

9          THE COURT:  I assume that.

10          MS. LOTZE:  All right.  Very good.

11          THE COURT:  I mean, you don't get people who

12   aren't somehow involved, allegedly, who are providing

13   information, even in a position to provide information.  So,

14   I mean, that's --

15          MS. LOTZE:  But I guess, what that says to me,

16   Your Honor, is if a person is arrested and can't give up a

17   person who's selling to them.  In other words, if a person

18   arrested has to say, I am at the top of the food chain, then

19   they've got nowhere to go.  So, that makes them even more of

20   a suspect when they have to point to somebody, to somebody

21   who sells to them in order to help themselves, so.

22          THE COURT:  Okay.  The evidence I think does

23   support the finding made by the Magistrate Judge of

24   Mr. Gersen's involvement in a conspiracy related to the

25   distribution of methamphetamine.  The, I think the evidence

1   clearly would suggest that there was some association with

2   that activity, in reference to his apartment.  The fact that

3   he was away at the time, at least around the time when the

4   arrest would have occurred, obviously factors in on what

5   weight you give to that evidence.

6          The -- Mr. Hylton's notes would suggest, again.

7   And again, in and of itself, Mark could be somebody else but

8   when you've got the other evidence linking Mr. Hylton to the

9   defendant, I think it's reasonable to infer that the

10  references in this document do in fact relate to Mr. Gersen.

11          I also would agree that it's reasonable, based

12  upon the entries, that these entries do in fact relate to

13  the alleged conspiracy that's being asserted in this case.

14  And the fact that I think it is significant, the fact that

15  he, even though counsel says she gave Mr. Gersen this

16  information about this other individual who had already been

17  charged and he had it in his person, because of that, I

18  think it does have relevance.

19          Because even though it was given by counsel to the

20  defendant, it does show his knowledge at the time, that an

21  individual who he had some association with had been charged

22  with this offense.  And then you've got the other evidence,

23  indicating that Mr. Gersen had been in the hotel room

24  earlier and then, he's observed walking in a direction

25  towards the hotel room when he's arrested, after he makes a

1   call, and he asked, is it all right or is it safe or

2   whatever, for me to come up?  Which would suggest that he

3   knew there was activity related to an investigation

4   regarding this conspiracy and he expressed concern about

5   whether it was safe for him to come up to the room where he

6   had been before, where according to witnesses, there was a

7   large amount of methamphetamine and a large amount of

8   currency related to that activity.

9        So, I do conclude that the evidence is sufficient

10  to support his detention.  And then, the question becomes,

11  are there conditions that can be imposed that would

12  adequately ensure his appearance at future court proceedings

13  and are there things that can be done that would ensure that

14  he would not pose a danger to the community and has he

15  overcome that?  I would tend to agree with the defense that

16  on the issue of flight, that conditions could be imposed

17  that would ensure that he would appear at future court

18  proceedings, despite the seriousness of the conduct

19  involved.  And then the question becomes, does he, has he

20  overcome the presumption in favor of detention based upon

21  him posing a danger to the community?

22        There's no question that methamphetamine is a very

23  troubling drug that one would hope doesn't gain a foothold

24  in the District of Columbia, because it has had a

25  devastating impact on other parts of the country as a result

1    of the devastating nature the drug, itself, and what it does

2    to people who use it.  The concern, I guess, I have in that

3    regard is, there is evidence that the government has that

4    would suggest that there was an ongoing conspiracy involving

5    this serious and dangerous drug.  And I think the evidence

6    would clearly support the proposition that Mr. Gersen knew

7    that there was an investigation by law enforcement, in

8    reference to this activity.

9            Not only based upon the fact that there was a

10   search of his residence, which I would have to assume, when

11   he comes back he knows something about it.  I assume that's

12   why he probably went to counsel, to get advice of counsel as

13   to what he does.  And then with knowledge of that and having

14   been in the hotel room earlier where the drugs were located,

15   according to a witness, he then for some reason leaves but

16   then he still is coming back to the room where this activity

17   is taking place.  Which would suggest that even though he

18   knew that this investigation was taking place in reference

19   to this activity, that nonetheless he was still prepared to

20   put himself back in the middle of that activity despite that

21   knowledge.

22           That raises a question it seems to me if he's

23   prepared to do that, with that knowledge, would the fact

24   that conditions by this Court would be imposed be sufficient

25   to cause him not to reinvolve himself in that activity.

1   Which as I said, is very serious behavior that has

2   devastating impacts on not only on individuals but to

3   communities where this drug is sold and used.  And under the

4   circumstances, it's unfortunate under -- considering his

5   status, under the circumstances, I would have to conclude

6   that the presumption has not been rebutted, that he would

7   not pose a danger if he were released.  So his bond review

8   motion will have to be denied.

9           We need to set a date in reference to Mr. Norris's

10  client regarding a bond hearing.  I will not be here next

11  week.  I am here the following week between Christmas and

12  New Years, because I have duty on this other court I serve

13  on.  So I could accommodate a hearing during that week if

14  counsel is available.

15          MR. NORRIS:  Your Honor, could I suggest, would

16  the Court be available tomorrow?  I don't think

17  Mr. Hylton's, the response from the government to Mr. Hylton

18  will not be significantly more complicated than what they've

19  already argued.  We certainly have no objection to them

20  responding orally as they did today.

21          THE COURT:  Is the government available tomorrow?

22  I guess, I can do it at 1:30.

23          MS. STEWART:  The government -- that is the 16th.

24  I am available.  However, I think -- may I consult with the

25  marshals one moment, Your Honor?

1          THE COURT:  Yes.

2          MS. STEWART:  I have another matter before the

3     Court.  One-thirty is agreeable, Your Honor.

4          THE COURT:  Very well.

5          MR. NORRIS:  Thank you, Your Honor.

6          THE COURT:  In reference to all of the cases, I

7     guess we'll need to come back shortly after the holiday

8     break.  And if counsel is not agreeable, which is

9     understandable, to the government's request for a tolling

10    60-days, I'll have to make a decision in reference to that.

11    Any decision I make would relate back to the date when the

12    government made its request for the tolling and we'll have

13    to assess whether that is appropriate.

14          I don't know if -- does the defense intend to file

15    anything in reference to that request in writing or you're

16    just going to orally state your position as to why you

17    oppose it?

18          MR. NORRIS:  Well, at this point, I would state

19    orally on behalf of Mr. Hylton, Your Honor.

20          MS. LOTZE:  Orally on behalf of Mr. Gersen.

21          MS. WICKS:  And Your Honor, I just need to discuss

22    with my client so I can file something in writing tomorrow.

23          THE COURT:  Well, I guess we can do it right after

24    the holidays.  As I said, any ruling I would make in

25    reference to that would relate back to the date when the

1    government made its request.  If we're going go forward to

2    try and have a trial in early to mid-February then any

3    motions will have to be filed very quickly.

4         I don't even know if counsel is going to be in a

5    position to file motions with not having received discovery

6    based upon the circumstances the government represents.  But

7    be that as it may, we'll set a date to come back for a

8    status hearing.

9         MR. NORRIS:  Your Honor, not knowing the Court's

10   calendar, the parties had discussed among themselves I

11   believe, Friday, January the 12th, if that is available to

12   the Court.  And we would need to do that after 11, because

13   both of the parties have matters across the street in

14   Superior Court.

15        THE COURT:  That's fine.  But we'd have to do it

16   at four o'clock, because I've got a full calendar in the

17   afternoon.

18        MR. NORRIS:  I believe that's fine with the

19   parties, Your Honor.

20        THE COURT:  Very well.  So, at that time I will

21   address the question as to whether the 60 days should be

22   tolled and hopefully, by then, some of the discovery will

23   have been provided.  Hopefully, a substantial portion of the

24   discovery will have been provided by then and we'll be in a

25   position to set a trial date, if a trial date has to be set

1  at that time.  Thank you.

2          MS. STEWART:  Thank you.

3          MR. NORRIS:  Thank you, Your Honor.

4          MS. LOTZE:  Thank you.

5          MS. SLAIGHT:  Your Honor, on behalf of Mr. Caudle,

6  I would ask for permission for him to go to Chesterfield,

7  Virginia which is south of Richmond about 200 miles from

8  here, over the holidays to be with his family?  He's from

9  Chesterfield, Virginia.

10          THE COURT:  Any objection to that?

11          MS. STEWART:  No objection.

12          MS. SLAIGHT:  Thank you.

13          THE DEPUTY CLERK:  We need a Proposed order.

14          MS. SLAIGHT:  I can submit a proposal.

15          THE COURT:  Just submit a Proposed Order

16  consistent with my authorizing him to do that, provided he

17  complies, otherwise complies with his conditions of his

18  release.

19          MS. SLAIGHT:  Yes, Your Honor.

20          MS. LOTZE:  Your Honor, on behalf of Mr. Gersen,

21  would the Court recommend his placement at CTF pending

22  trial?  There are significant medical concerns that cause

23  the issuance of a medical alert that haven't resulted in

24  adequate medical care.

25          THE COURT:  If you want to discuss that at the

1    bench.

2            [Bench conference.]

3            MS. LOTZE:

4

5            THE COURT:

6            MS. LOTZE:

7            [Open court.]

8            THE COURT:  I order he be placed at CTF for

9    medical reasons and that he'd be provided the appropriate

10   medications that he's in need of.

11           MS. LOTZE:  I'll submit an order to that effect.

12           THE COURT:  Very well.  Thank you.

13           [Thereupon, the proceedings adjourned at

14           10:48 p.m.]

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE

2           I, Cathryn J. Jones, an Official Court Reporter

3    for the United States District Court of the District of

4    Columbia, do hereby certify that I reported, by machine

5    shorthand, the proceedings had and testimony adduced in the

6    above case.

7           I further certify that the foregoing 43 pages

8    constitute the official transcript of said proceedings as

9    transcribed from my machine shorthand notes.

10          In witness whereof, I have hereto subscribed my

11   name, this the 27th day of March, 2012.

12

13

14                          /s/_____
                            Cathryn J. Jones, RPR
15                          Official Court Reporter

16

17

18

19

20

21

22

23

24

25