1

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | Case No. 1:11-CR-00353 |
| | . | (RBW) |
| Plaintiff, | . | |
| | . | Washington, D.C. |
| v. | . | December 7, 2011 |
| | . | |
| MARC GERSEN, LEE HYLTON, | . | |
| | . | |
| MICHAEL TALON AND JOHN | . | **FILED** |
| | . | |
| CAUDLE, | . | APR 2 2 2012 |
| | . | |
| Defendants. | . | Clerk, U.S. District & Bankruptcy |
| . . . . . . . . . . . . . | . . | Courts for the District of Columbia |

DETENTION HEARING
BEFORE THE HONORABLE JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:       U.S. Attorney's Office
                         By:  PATRICIA STEWART, AUSA
                         555 Fourth Street, N.W.
                         Washington, DC 20530

For Defendant Gersen:    Lotze Mosley, LLP
                         By:  NIKKI U. LOTZE, ESQ.
                         503 D Street, N.W.
                         Suite 300
                         Washington, DC 20001

For Defendant Hylton:    Law Offices
                         By:  JON W. NORRIS, ESQ.
                         503 D Street, N.W.
                         Suite 250
                         Washington, D.C. 20001

APPEARANCES (CONTINUED):

For Defendant Talon:      Carney & Carney
                          By:   JOHN JAMES CARNEY, ESQ.
                          601 Pennsylvania Avenue, NW
                          Suite 900 South Building
                          Washington, DC 20004

For Defendant Caudle:     Law Offices
                          By:   JOANNE D. SLAIGHT, ESQ.
                          717 Fifth Street, NW
                          Washington, DC 20001

1           (Proceedings commenced at 2:35 p.m.)

2               THE CLERK:  This is Criminal Case, Year 2011-

3       353, <u>United States of America v. Marc Gersen</u>, Defendant

4       Number 1; <u>Lee Hylton</u>, Defendant Number 2; <u>Michael</u>

5       <u>Talon</u>, Defendant Number 3 and <u>John Caudle, III</u>,

6       Defendant Number 4.

7               Patricia Stewart representing the Government.

8               Nikki Lotze representing Mr. Gersen.

9               Jon Norris representing Mr. Hylton.

10              John Carney representing Mr. Talon.

11              Joanne Slaight representing Mr. Clark, III

12              This is an arraignment and detention hearing.

13              Will Defendant please stand.

14              Gentlemen, please stand.

15          (The Defendants are Sworn.)

16              THE CLERK:  Thank you, please remain

17      standing, Gentlemen.

18              THE COURT:  Gentlemen, last time we were

19      together you were being presented, as they say, on a

20      Complaint made by a police officer.

21              What has now happened is the Grand Jury has

22      considered this case and returned an Indictment, so I

23      want to talk to you a little bit about that Indictment.

24              This is a Indictment returned by the Grand

25      Jury on December 6th, and it charges Gersen, Hylton,

1    Talon and Caudle with the crime of combining and

2    conspiring to distribute, and possess with intent to

3    distribute more than 500 grams of methamphetamine.

4            With reference to these charges, the rights

5    you have are different from the ones I described

6    previously.  We are now at the next stage of this case,

7    meaning that the first right you have will be, of

8    course, the right to have this case tried before a

9    jury.

10           At that trial, the Government will have to

11   present its witnesses.  They are going to have to

12   testify in your presence, subject to cross-examination

13   by your attorneys.

14           Additionally, the Government will have to

15   establish the case beyond a reasonable doubt, and you

16   can never be forced to be witnesses against yourself.

17   You will, of course, have the right to issue subpoenas

18   to bring to court the witnesses you wish to testify or

19   documents you wish to place in evidence.

20           I see there's been a slight change in counsel

21   since we were last together, and I'm going to assume

22   that at least two of you have retained counsel.  You,

23   of course, have the absolute right to retain any lawyer

24   you wish.  Please bear in mind, however, that if there

25   ever comes a time when, for any reason whatsoever, you

1    can no longer afford counsel, counsel will be appointed

2    for you.  At no point, gentlemen, would you ever be

3    forced to go to trial or do anything else in this case

4    without attorneys.  Thank you.

5              Having been advised of your rights, would

6    your counsel please advise me how you plea.

7              Ms. Slaight?

8              MS. SLAIGHT:  Your Honor, on behalf of Mr.

9    Caudle, we'll waive a formal reading of the Indictment,

10   plead guilty -- plead not guilty to each and every

11   count of the Indictment and -- just one count, and

12   request a speedy jury trial.

13             THE COURT:  Thank you very much.

14             Yes, Counsel?

15             MS. LOTZE:  Good afternoon, Your Honor.

16             Nikki Lotze on behalf of Mark Gersen, and on

17   behalf of Mr. Gersen we would waive further reading,

18   enter a plea of not guilty, assert Mr. Gersen's Fifth

19   and Sixth Amendment rights to counsel with respect to

20   this and any other matter, and request a speedy trial.

21             THE COURT:  Thank you.

22             MR. NORRIS:  Good afternoon, Your Honor.

23             Attorney Tom Norris on behalf of Mr. Hylton.

24   On behalf of Mr. Hylton, likewise, we would waive a

25   further or formal reading of the Indictment, assert all

1    of his constitutional rights, including his speedy

2    trial rights, and enter a plea of not guilty.

3              Thank you.

4              THE COURT:  Thank you.

5              MR. CARNEY:  Good afternoon, Your Honor.

6              On behalf of Mr. Talon, he waives the formal

7    reading of the Indictment, enter a plea of not guilty

8    to the charges, requests a speedy jury trial.

9              In addition, he's been served with a copy of

10   the Indictment and it's been reviewed with him.

11             THE COURT:  Thank you very much.

12             Pleas of not guilty will be entered.

13             Gentlemen, you may be seated.  Everyone may

14   be seated.

15             Ms. Stewart, you have an application?

16             MS. STEWART:  Your Honor, the Government is

17   moving for the pretrial detention of Defendants Gersen

18   and Hylton on the grounds of dangerousness.

19             After being able to have a few days to

20   investigate this matter further, and consult with

21   counsel about potential arrangements, we believe that

22   it's possible to fashion conditions or combinations of

23   conditions that would ensure the safety of the

24   community and make a risk of flight with respect to

25   Defendants John Caudle and Michael Talon.

1           So we are prepared to proceed with a

2    detention hearing by proffer with respect to Mr. Hylton

3    and Mr. Gersen.

4           THE COURT:  All right.  Please proceed.

5           MS. STEWART:  Your Honor, in this case,

6    excuse me, the Defendants, of course, are charged by an

7    offense punishable by more than ten years and there is

8    a rebuttable presumption that they are -- present a

9    danger to the community.  Excuse me.

10          I would note that the offense that they have

11   been indicted for is punishable by a mandatory minimum

12   term of ten years imprisonment.

13          With respect to the factors that the Court

14   considers, we are aware that Mr. Gersen is a law

15   student at Georgetown University and thus has a

16   significant tie to the community.

17          We are aware that Mr. Hylton has contacts in

18   the community and indeed he maintains two addresses,

19   one in the District of Columbia that he uses to

20   register for post office boxes in the District of

21   Columbia and to vote in the District of Columbia, and

22   he maintains another address in Arlington, Virginia

23   that he's provided to Pretrial Services and Department

24   of Motor Vehicles.

25          Our request for pretrial detention is based

1    on the seriousness and nature of the offense and the

2    strength of the Government's evidence.

3        The Government's evidence, which we would

4    present at trial in this case, both in the form of

5    eyewitness testimony and documentary evidence, as well

6    as seizures by police and DEA agents, would establish,

7    for the reasons I've set forth to the Court, that both

8    Mr. Gersen and Mr. Hylton are major distributors,

9    wholesale level distributors of methamphetamine not

10   only in the District of Columbia, but in other areas.

11       They have sources in California, Atlanta and

12   other cities.

13       Specifically, and I think the easiest thing

14   for counsel and for the Court, is if I proceed

15   chronologically in this case.

16       THE COURT:  Please do so.

17       MS. STEWART:  As early as mid October of this

18   year, two independent sources, both of whom are very

19   familiar with the methamphetamine trafficking in this

20   city, provided Mr. Gersen's name to Metropolitan Police

21   officers as a supplier of methamphetamine.  Their

22   representations were based on their personal contacts

23   with Mr. Gersen.

24       On Monday of last week there was a meeting at

25   Mr. Gersen's apartment.  Mr. Gersen wasn't present, he

1    was out of the area, but significantly, one of his co-
2    Defendants, Mr. Talon, had been living in his apartment
3    and, on Monday they were joined by two other co-
4    Conspirators, Mr. Caudle and Mr. Hylton.

5            During that meeting at Mr. Gersen's
6    apartment, to which they all have access, Mr. Caudle
7    brought in bags containing some amount of
8    methamphetamine and scales.

9            Mr. Hylton discussed money, price of sales of
10   methamphetamine, increasing business of the
11   Conspirators in distributing methamphetamine, and at
12   some point during that Monday evening meeting, directed
13   Mr. Caudle to make sales at a specific location in the
14   District of Columbia, (inaudible) the Government would
15   characterize as retail amounts of methamphetamine.

16           THE COURT:  Who gave that direction, please?
17           MS. STEWART:  Mr. Hylton, and the Government
18   would present that -- as proof, eyewitness testimony.

19           Following day, on Tuesday of last week,
20   Metropolitan Police officers executed a search warrant
21   at Mr. Gersen's apartment, at the Imperial House, and I
22   apologize, I don't have the exact address in front me.
23   I believe it's in the initial charging document.  No,
24   it's not in the initial charging document.

25           No one was home during the execution of the

1    warrant.  They recovered a relatively small amount of

2    methamphetamine, packaging material, GHB, a recipe for

3    producing, or cooking, making GHB, potassium and other

4    chemicals that are used to make GHB.

5            They also recovered mailing envelopes with

6    hundreds, I don't have the exact amount, hundreds of

7    dollars in some of them, ready to be mailed, not

8    addressed.  As I indicated, no one was home for the

9    execution of that search warrant.

10           Subsequently, (unintelligible) the Government

11   would present this through eyewitness testimony.  Mr.

12   Talon notified Mr. Hylton and the co-Conspirators, with

13   the exception of Mr. Gersen, who wasn't present, moved

14   to a hotel in the District of Columbia, and held

15   meetings on Tuesday and Wednesday to discuss the search

16   warrant that was executed at Mr. Gersen's apartment.

17           According to the witness, Mr. Hylton openly

18   discussed payments that had to be made to suppliers.

19   He discussed source cities.  He discussed who owed how

20   much money, and the Conspirators contacted Mr. Gersen

21   by telephone.

22           And in the hotel they discussed how they were

23   going to deal with the search, how they would discredit

24   the police officers, and how they would attack the

25   warrant.

1         On, excuse me, Wednesday, they moved to the
2    -- Mr. Talon and another individual moved to the hotel
3    where the -- the Beacon Hotel in the District of
4    Columbia, and again, through eyewitness testimony we
5    would establish that at that time Mr. Hylton brought
6    quantities of methamphetamine to the hotel.  He
7    continued to have discussions about prices; that there
8    was a delivery from an unidentified source, of
9    additional methamphetamine to the hotel.
10        Mr. Talon was in the hotel, along with Mr.
11   Hylton and Mr. Caudle, who came and went at various
12   times.
13        On Thursday, Mr. Gersen arrived back in the
14   area.  Through eyewitness testimony we will present Mr.
15   Gersen arrived at the hotel earlier in the day, before
16   the search warrant was executed.  He left the hotel
17   before the search warrant was executed, and he was not
18   in the hotel room when police officers entered the
19   hotel room and searched it.  He did, however, place a
20   telephone call to the hotel room.  A police officer
21   answered it.  Mr. Gersen asked whether it was safe to
22   come up.  The officer said it was.  Before Mr. Gersen
23   could arrive at the room, however, he was intercepted
24   and he was placed under arrest.
25        Of -- In addition to eyewitness testimony,

1    Your Honor, there is a significant amount of evidence

2    that will support the conspiracy charges.  Within the

3    hotel room, when the officers entered, there was over

4    600 grams of crystal methamphetamine, and that does

5    include packaging.

6              There was over $4,000 in cash.

7              There were receipts for Mr. Hylton for the

8    order of two digital scales commonly used by drug

9    dealers to weigh gram amounts of drugs.  One was for a

10   50 gram scale, digital scale.  One was for a 100 gram

11   digital scale, and two such scales were recovered in

12   the hotel room.

13             There was also recovered in the hotel room, a

14   handwritten ledger.  The ledger was written by Mr.

15   Hylton.  Indeed, it had two parts.  The first several

16   pages there is embossed in the stationery "Lee M.

17   Hylton."

18             The second portion of the ledger has a

19   typewritten heading, "If Lost Return To:" and the

20   handwritten notation, "Lee Hylton", with a phone number

21   and an e-mail address.

22             In that ledger there are -- which goes from

23   May of this year until November 26th of this year,

24   there are detailed notations.  In some portions of it

25   there are daily notations, other ones weekly, but it

1   contains what are obvious drug amounts and payments for

2   the drugs.  Indeed, at some places there is literally a

3   "G" for gram, "OZ" for ounces, followed by amounts that

4   officers and agents recognize as amounts of drugs.

5           There are references to "3.8 grams" and

6   "Balls", and as the Court may know, and I would

7   proffer, that is commonly called an "Eight Ball."

8   These are throughout the ledger.

9           There are references to Mike -- "Mikey",

10  which presumably is Mr. Talon.

11          And there is a reference near the beginning

12  of the ledger, to Marc Gersen.  The first names are

13  spelled out in the ledger.  After that, there are

14  numerous references to "Marc", and Marc is spelled in

15  the ledger the way Mr. Gersen spells his first name;

16  that is, M-A-R-C.

17          There are entries concerning sodium and

18  potassium, which are used to manufacture GHB, and we

19  note again, those drugs were found in Mr. Gersen's

20  apartment.

21          There is a reference to a money package to

22  Marc in August, and numbers of money.

23          That, combined with witness testimony, that

24  the witness heard Mr. Hylton saying that Mr. Gersen

25  traveled out of the area, brought money to source

1    cities, and arranged for methamphetamine to be shipped

2    back by the mail, we submit it's corroboration of that

3    witness testimony, the entry money packs to Marc.

4           Also significantly, Your Honor, there is an

5    entry in there that, excuse me, refers to "Jeremy", and

6    I would proffer to the Court, and the Court can take

7    note, that an individual named Jeremy Placina

8    (phonetic) has been arrested and charged with a similar

9    offense in this court.  The entry speculates that

10   Jeremy, "Will implicate Nick and Marc."

11          Those are some of the factors that, Your

12   Honor, we would proffer to the Court with the respect

13   to the involvement of Mr. Gersen and Mr. Hylton at the

14   highest level of methamphetamine trafficking.

15          And for those reasons we submit that --

16          THE COURT:  I'd like you to -- Now that

17   you've done that and you've laid it all out

18   chronologically, why do you think that Gersen and

19   Hylton, in particular, are eligible for detention?  Of

20   the people that you've been investigating for the past

21   two weeks, what it is about them that compels the

22   conclusion that they are particularly involved at a

23   very high level of drug dealing in a dangerous drug?

24          MS. STEWART:  As I indicated, Your Honor, we

25   have eyewitness testimony that Mr. Hylton is the one

1    who -- Mr. Hylton was the individual who directed Mr.

2    Caudle where to sell and how much to sell retail drugs.

3          Mr. Hylton is the individual who spoke openly

4    in front of the conspirators and the witness about

5    money payments to Marc; that is, Mr. Gersen, to obtain

6    large quantities of methamphetamine.  He essentially

7    directed the operation with Mr. Gersen.

8          It is their role in the conspiracy which is

9    corroborated, again, by the ledger, showing amounts and

10   showing trips by Mr. Gersen.

11         Our view is, and we believe the evidence

12   supports the conclusion that they were at the highest

13   level; that Mr. Caudle engaged in retail sales at their

14   direction; and that Mr. Talon was also involved and --

15   significantly involved, but not to the level of

16   managing the enterprise the way Mr. Gersen and Mr.

17   Hilton did.  And we'd submit they have not and cannot

18   rebut the presumption issue (inaudible).

19         THE COURT:  One question I have, which I've

20   had for most of these cases over the past two weeks,

21   what is the reason, if any, why this is not

22   domestically manufactured in the District of Columbia?

23   Why does it have to come from another place if the

24   chemicals to make it are allegedly easy to find.

25         MS. STEWART:  Your Honor, I can't answer --

```
1            THE COURT:  I mean, I have had many of these
2    cases where the stuff is flown in from California,
3    flown here and flown there, but there is some reason of
4    which I'm not aware, that you have to go to another
5    place to get?  Or so it seems from --
6            MS. STEWART:  We're basically unaware of
7    meth labs in the District of Columbia.  They may very
8    well exist but, to date, our evidence has been that
9    source cities are outside of the District at this time.
10            THE COURT:  All right.
11            Before I hear from the Defense, I have a
12    Grand Jury waiting I'd like to take care of.
13            Ms. Cheta (phonetic), please come up to the
14    front, please.
15        (Recess in place.)
16                        AFTER RECESS
17            THE COURT:  Let me hear from counsel for Mr.
18    Gersen, pleas
19            MS. LOTZE:  Yes, Your Honor.  I believe that
20    -- I was taking notes and it's hard for me to both
21    listen and take notes, but I believe that I heard the
22    Government concede that Mr. Gersen was not present
23    during the search warrant that was executed at the
24    condo which they are ascribing to him.  That search
25    occurred on November 30th, or no, I'm sorry, on
```

1   November 28th, and I believe that the -- or maybe it

2   was the 30th.  At any rate, I believe that the

3   Government conceded that Mr. Gersen was not present.

4           It's actually the case that Mr. Gersen wasn't

5   even in the jurisdiction.  I've had the opportunity to

6   verify that he was elsewhere with family for the

7   Thanksgiving holiday, between the dates of November

8   22nd and November 30th.  So to the extent that there

9   were activities occurring in the condo which, from the

10  Government's proffer it sounded like Mr. Talon and Mr.

11  Hylton, and maybe others were involved in, Mr. Gersen,

12  you know, wasn't even there.  He certainly wasn't

13  present.

14          And I'm -- I know the Court presided over the

15  initial appearance in this case, and I presume made

16  detention decisions based on what's represented in the

17  Gerstein (phonetic), and there's an inaccuracy in the

18  Gerstein.  In the Gerstein it's reflected that Mr.

19  Gersen was in the hotel room where the over 600 grams

20  of methamphetamine were found, and the Government, I

21  heard today, conceded that, in fact, he wasn't even

22  inside the building, much less in the room.  He was

23  arrested outside the building coming, you know, coming

24  towards the hotel I guess.

25          So to the extent that the Court's decision of

1    -- concerning detention is based on the strength of the

2    Government's evidence, you know, Mr. Gersen is the

3    least connected person to the items that are recovered,

4    I think, you know, of the four before you.

5         I would also note, I mean, I had an

6    opportunity to get Mr. Gersen's transcript from the

7    Georgetown University Law Center, which I shared with

8    the Government and would be happy to proffer to the

9    Court.  It reflects that he's a student at Georgetown

10   University Law Center, that he's doing very well there.

11        He -- The Pretrial Services Report reflects

12   no prior criminal history.  He is a person who, I

13   think, could be released on personal recognizance, with

14   instructions to return to court as required.

15        As a fall-back position, I'd be also

16   perfectly amenable to high intensity supervision.

17        So I think that those two arrangements would

18   satisfy the Court that Mr. Gersen would not present any

19   risk to the community, certainly with a person who, as

20   the Pretrial Services reflects, no prior criminal

21   history who, you know, tested negative at lock-up, I'm

22   told.

23        I did contact Pretrial Services yesterday and

24   was told that that result, although it does not appear

25   in the Pretrial Services, the bail review sheet,

1   Pretrial Services did relate to me that his drug test
2   was negative.
3          And, Your Honor, I would note, as well, that,
4   and I'm sure the Court reviewed these documents at the
5   time of the initial appearance, the search warrant
6   affidavit, the affidavit in support of the search
7   warrant of Mr. -- the apartment that the Government
8   ascribes to Mr. Gersen, was based, from what the
9   officer who signed it said on the information that he
10  got from a person who was, in the officer's words, you
11  know, trying to work off his own case.  And so to the
12  extent that the Government relies on the testimony or
13  the proffer of what eyewitnesses would say, it's
14  eyewitnesses who, as the Courts were made aware, are
15  trying to help themselves, which always presents a
16  certain amount of difficulty for the Government in
17  proving cases.
18         So given the fact that Mr. Gersen was not in
19  the jurisdiction at the time that, you know, the
20  apartment which the Government ascribes to him was
21  searched, given the fact that he wasn't in the hotel
22  room when evidently one of the sources on whom the
23  Government relies said that he would be, so we know
24  that there's at least some reason to think that this
25  source is not providing accurate information, I think

1     that the Court should take those matters into

2     consideration, take into consideration Mr. Gersen's

3     ties to the community, and either order him placed on

4     personal recognizance or place him in the High

5     Intensity Supervision Program.

6               I just finally did want to say that Mr.

7     Gersen's parents live in Florida.  I have been in touch

8     with them, and his mother traveled to D.C. today to

9     support him.  She'd been here previously to support

10    him, and so he does enjoy community support, the sort

11    that would assist him in both returning to court and

12    not presenting any sort of danger to the community

13    while the case is pending.

14              THE COURT:  Thank you.

15              Counsel for Mr. Hylton, please.

16              MR. NORRIS:  Thank you, Your Honor.  Your

17    Honor, Tom Norris for Mr. Hylton.

18              Your Honor, we would just note the Government

19    has elected to proceed by proffer, and much of the

20    Government's proffer references information that came

21    from an eyewitness.  And I would just reference, as Ms.

22    Lotze did, the Gerstein statement of facts in this case

23    talks about how the Metropolitan Police Department

24    received information from a source, that four subjects

25    would be at this hotel room, but I think it's important

1   to note that the hotel room was one that was being

2   rented by the source, Your Honor.  And, in fact, it was

3   the same source that gave the officers written consent

4   to come into the hotel room.

5         And so I think it's clear that this source is

6   someone who not only is in legal trouble and difficulty

7   themselves, and trying to work things off through

8   cooperation with the Government, but has a significant

9   motive or bias to shift blame for their own conduct

10  onto other individuals.

11        So I think to the extent that the Government

12  would have the Court rely upon its representation of

13  eyewitness testimony, the credibility of that

14  eyewitness is certainly called into question, Your

15  Honor.

16        Mr. Hylton is an individual, Your Honor, who

17  has lived in the Washington, D.C., northern Virginia

18  area for ten or eleven years.  He's originally from

19  Richmond, Virginia, just to the south of us.  He has

20  significant ties to the Richmond area, as well as

21  Washington, D.C.

22        The addresses that the Government referred

23  to, he has one address that he's living at, and that's

24  the northern Virginia address, Your Honor.  The other

25  was simply a UPS mail box address in the District of

1    Columbia.

2            And so for all those reasons, we believe --

3    Also, Your Honor, he is -- he is trained as a

4    mechanical engineer.  He has a degree in mechanical

5    engineering and he has worked as a materials engineer

6    for Allied Signal, which is a company that is

7    affiliated with Honeywell.  He's not currently employed

8    there, Your Honor, but due to the current economic

9    conditions, you know, he is someone who does have

10   skills, who could be employed.

11           We do think that this Court can fashion

12   conditions of release that both assure the safety of

13   the community and assure his appearance in court.

14           I don't believe there is any risk of flight.

15           He has no prior contacts or criminal

16   convictions, Your Honor.

17           This is a serious matter.  He does want to

18   have this matter resolved through the court system.

19           And so for all those reasons we believe that

20   he can overcome any presumption, and that this Court

21   can fashion conditions.  Certainly through heightened

22   supervision, we believe he would meet all of their

23   criteria, and that he would be present and not a danger

24   to the community, Your Honor.

25           THE COURT:  Ms. Stewart, you have the burden

1    of proof.

2           Any final thoughts?

3           Ms. Lotze's emphasized the fact that Mr.

4    Gersen was not on the premises when many of these

5    events occurred.

6           Is that significant, from your point of view?

7           MS. STEWART:  Not for the conspiracy charge,

8    Your Honor, no.

9           I would want to clarify something, so there's

10   no confusion.

11          Ms. Lotze referred to a source who himself

12   was "working off a beef" as the source of information

13   that led to the search warrant -- issuance of the

14   search warrant for Mr. Gersen's apartment.  That is

15   quite true.  That person is not the same person that

16   provided the eyewitness and ear witness testimony about

17   the discussions that I proffered.  That second

18   individual is not in any legal difficulty, and after an

19   investigation, the Government is satisfied that that

20   person was not implicated in this conspiracy for a

21   variety of reasons.

22          So I just want to be clear that these are not

23   the same individuals and, --

24          THE COURT:  All right.  I --

25          MS. STRAIGHT:  -- of course, Mr. --

1          THE COURT:  This conversation that is had

2     after the search warrant is had, who participates in

3     that conversation?

4          MS. STEWART:  After the search warrant was --

5          THE COURT:  And they decide how to attack the

6     warrant, and so forth.

7          MS. STEWART:  Our information is Mr. Hylton,

8     Mr. Talon, Mr. Caudle was present at parts of it.  I

9     frankly cannot tell the Court how much of that he

10    participated in.  As we indicated, he was present but

11    he also left to make retail sales.

12         So how much of that he participated, we

13    simply -- at this point, I cannot tell the Court with

14    any accuracy, but Mr. Hylton and Mr. Talon did, and our

15    information is they contacted Mr. Gersen by telephone

16    and told him they had to have a meeting and discuss

17    what to do, where to move things, and how to attack the

18    warrant and to discredit the police officers.

19         THE COURT:  Thank you very much.

20         I'm going to grant the Government's

21    application as to Gersen and Hylton for the reasons I

22    will specify at much greater length in a detention

23    memorandum in accordance with the crime that they're

24    before me.

25         I have been in the unique position in these

1    cases, since I arrived in criminal, since December 1,

2    having presided over the hearing of the related case

3    from the other gentlemen, whom I held, and also having

4    ruled on the Government's applications for the various

5    warrants that were issued in this case.

6         Now that the Grand Jury has acted, there is

7    additional evidence which I find quite powerful, that

8    this is a conspiracy that, as portrayed by the evidence

9    before the Grand Jury, has -- certainly crosses state

10   lines and brings into the District of Columbia,

11   substantial amounts of this drug.

12        It does not surprise me that the ledger, as

13   found, indicates that very large quantities are being

14   sold for very large amounts of money, that substantial

15   quantities are found at various places where the

16   conspirators are.

17        I find most damning, I think, perhaps, the

18   ledger book, which confirms in writing, at a time when

19   obviously it can't be blamed on some informant, where

20   the notations are further indications of a very large-

21   scale conspiracy to sell a drug.

22        I find it thoroughly remarkable that even

23   after the search has occurred and it is quite clear to

24   the Conspirators, that they are the focus of police

25   activity, they are -- once again seem ready to resume

1   their activity and do, in fact, do so.  It gives me no
2   confidence that they would be anymore faithful to the
3   conditions I would set if I were foolish enough to
4   release them.
5           The Government's motion is granted.  The
6   Court will issue detention memoranda.
7           Matter is set down before Judge Walton on the
8   15th day of December at 9:30 a.m.
9           MS. STEWART:  Your Honor, with respect to Mr.
10  Caudle and Mr. Talon --
11          THE COURT:  I'm about to set conditions of
12  release.
13          I'd like to hear from the Pretrial Services
14  agent.
15          Sir, what is your recommendation as to those
16  gentlemen?
17          THE PRETRIAL SERVICES OFFICER:  Andre Sidbury
18  for D.C. Pretrial Services.
19          Your Honor, based on the Defendants not
20  having a criminal history, we would request that the
21  Defendant be released on personal recognizance with the
22  conditions of report in person by telephone once --
23          THE COURT:  As opposed to involvement in the
24  Heightened Intensity Supervision Program?
25          THE PRETRIAL SERVICES OFFICER:  Yes, Your

1   Honor, based on their criminal history.

2           THE COURT:  All right.

3           Given that application and -- Any objection

4   by the United States?

5           MS. STEWART:  No, only an additional request,

6   Your Honor.

7           With respect to Mr. Talon, who is not a

8   United States citizen, he's a Canadian citizen, we are

9   confident, for a variety of reasons, that he's

10  employed, he's seeking medical -- other reasons that he

11  will not flee.  However, we would ask that if he has

12  access to any passport, that it be surrendered through

13  his counsel to the Court.

14          THE COURT:  All right.

15          In reference to Talon and Caudle, the Court

16  will accept the recommendation of the Pretrial Services

17  agent and release both men on their personal

18  recognizance.

19          They shall reside at the addresses they have

20  provided the Pretrial Services Agency.  They shall not

21  leave those addresses or the District of Columbia

22  without the written permission of Judge Walton, in

23  advance.

24          Either gentleman, whether they have a

25  passport from this country or any other, will surrender

1    that passport to the Pretrial Services Agency with the

2    understanding it will be returned to them upon the

3    conclusion of these matters.

4            Both men will also report to the Pretrial

5    Services Agency no less than once a week and -- Does

6    the Pretrial Services Agency recommend the regimen of

7    drug testing?  I think, given the nature of the crime,

8    that would be appropriate.

9            THE PRETRIAL SERVICES OFFICER:  That is, Your

10   Honor.

11           THE COURT:  They should also report for the

12   purposes of drug testing.  Those reports shall be made

13   available to Judge Walton for the purposes of

14   ascertaining whether involvement in drug treatment is

15   appropriate.

16           Yes, Counsel?

17           MR. CARNEY:  Your Honor, with respect to my

18   client, --

19           THE COURT:  Your client is Mr. Caudle?

20           MR. CARNEY:  Talon, I'm sorry.

21           THE COURT:  Mr. Talon.

22           MR. CARNEY:  Your Honor, we do not have a

23   good address for him.

24           THE COURT:  He'll report to the Pretrial

25   Services Agency tomorrow morning for verification of

1    his address.  If there are continuing problems with

2    reference to his address the matter will be brought

3    back before me tomorrow.

4              Yes?

5              MS. STEWART:  Your Honor, the address he gave

6    Pretrial is Mr. Gersen's apartment.

7              THE COURT:  Oh, I see.

8              MS. STEWART:  And, first of all, he won't be

9    allowed in.

10             THE COURT:  Of course.  All right.

11             Well, he has to work on that with you and Mr.

12   Carney, and see where he's going to live.

13             MR. CARNEY:  Yes, Your Honor.

14             THE COURT:  Is he -- Would it be likely that

15   he will leave the area and go -- for example, go live

16   with his parents somewhere?

17             MR. CARNEY:  No, Your Honor.  He's going --

18   He --

19             THE COURT:  He's got to find a residence.

20   All right.

21             MR. CARNEY:  Correct.

22             THE COURT:  Well, let's get him out of jail

23   first, and then have him report to the Pretrial

24   Services Agency and get more information about where he

25   will live, and at that point I will amend my order to

1    use the new address as the place from which he will --

2    which will be his official court address, and he will

3    not be permitted to leave that address and travel

4    anywhere without the permission of Judge Walton in

5    advance.

6          MR. CARNEY:  May I have clarification?  You

7    spoke fast there.

8          He's to be released today --

9          THE COURT:  I hope so.

10         THE PRETRIAL SERVICES OFFICER:  Tomorrow.

11         THE COURT:  I can't give you any assurance he

12    will, in fact, get out today.  Let's assume he gets out

13    today.  I expect him at Pretrial Services tomorrow

14    morning to work on this question of his address.

15         If he is not released today and is released

16    tomorrow, then I expect him to be at Pretrial Services

17    the next day, to work on the question of his address.

18         MR. CARNEY:  I understand.

19         THE COURT:  I'm just saying that since he may

20    not be able to release, you may be able to begin to

21    work on that by contacting his family.

22         Thank you.

23         Defendants are remanded, except those two who

24    are being released will be released eventually.

25         Counsel are excused with the thanks of the

 1   Court.

 2              Please note again, status hearing December

 3   15th at 9:30 a.m.

 4              THE CLERK:  Okay.  Two need to be remanded.

 5              The ones that being released need to remain

 6   in the courtroom to sign papers.

 7         (Proceedings concluded at 3:31 p.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings

in the above-entitled matter.


/s/_____          April 22, 2012

STEPHEN C. BOWLES